_____
Honorable Gary Spraker
United States Bankruptcy Judge

Entered on Docket
March 22, 2023

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                 )
                                       )        Case No.: 20-12051-gs
FRESH MIX LLC,                         )        Chapter 7
                                       )
                    Debtor.            )        Closing Argument: November 22, 2022
                                       )        Hearing Time: 9:30 a.m.
_____)

## MEMORANDUM DECISION ON OBJECTION TO PROOF OF CLAIM NO. 7

Before the court is the objection (Objection) of petitioning creditor Get Fresh Sales, Inc.

(GFSI) to proof of claim no. 7 (Claim 7) filed by EITE Recovery, LLC (EITE) (ECF No. 442,

replaced at ECF No. 769). The parties' claim dispute is another chapter in an ongoing battle

between GFSI, the majority owner of the debtor, on the one hand, and Paul Lagudi and William

Todd Ponder, as the debtor's minority owners, on the other. For the reasons set forth below, the

court will enter an order disallowing Claim 7.

### Background

**A. Fresh Mix and its Operations**

GFSI is a produce distribution company that has been operating since 1990 in the

southwestern region of the United States. Paul Lagudi and William Todd Ponder started their

own produce company, Lagudi Enterprises, LLC, in 2001 to supply value-added produce. Lagudi

Enterprises would chop or cut produce for resale in individual packages, mixes and blends. Trial

Transcript, ECF No. 846, at p. 17:19-25. While the businesses of GFSI and Lagudi Enterprises did not completely overlap, they were competitors. Trial Transcript, ECF No. 844, at pp. 220:24-221:4.

In 2010, GFSI purchased Lagudi Enterprises. After the purchase, the parties formed a new company, Fresh Mix LLC (Fresh Mix). GFSI describes Fresh Mix as primarily "a marketing entity, reliant on Get Fresh's infrastructure." ECF No. 825 at p. 2:5-6. The owners (Members) of Fresh Mix consisted of GFSI, Lagudi, and Ponder. GFSI owned 60% of the membership interests. Lagudi owned 30% of Fresh Mix, while Ponder owned the remaining 10%. *See* Trial Exhibit 22, ECF No. 830-22, at p. 42. The limited liability agreement (LLC Agreement) for Fresh Mix described the purpose of the new business as "to engage in the business of distributing food products of every kind and nature…." *Id.* at p. 8, ¶ 2.4. The LLC Agreement further stated that GFSI would: "provide [Fresh Mix] with such operational and administrative support as reasonably necessary in order for [Fresh Mix] to conduct the business comprising the Purchased Assets contributed by [GFSI] and [Lagudi and Ponder] to Fresh Mix…." *Id.* at pp. 15-16, ¶ 5.4(c).

The LLC Agreement also provided that the board of managers would consist of three GFSI managers and two managers appointed by Lagudi and Ponder, though Lagudi and Ponder were to serve as managers so long as they were members of Fresh Mix. *Id.* at p. 14, ¶ 5.2(a) and (b). Scott Goldberg, Dominic Caldara and John Wise signed the LLC Agreement as the three GFSI Managers. *Id.* at p. 63.  In addition to being a member and manager of Fresh Mix, Lagudi also served as its president. *See* Trial Exhibit 16, ECF No. 830-16. Goldberg served as Chief Financial Officer for GFSI and Fresh Mix. *See* Trial Transcript, ECF No. 844, at p. 152:20-24.

//

The exact nature of Fresh Mix's business is ill-defined. The best description was offered by GFSI:

> Fresh Mix was formed as an "asset-light" marketing entity, reliant on Get Fresh's infrastructure. That is, Fresh Mix, through the marketing activities of the Minority, would generate retail grocery and restaurant accounts, and Get Fresh would provide the goods, services, administrative overhead and related operational expertise needed to service those accounts.

ECF No. 825, at p. 7:9-13. Accordingly, Fresh Mix actually did little on its own. Rather, it sought out and acquired accounts for cut produce. Pursuant to the LLC Agreement, GFSI would purchase and obtain the product, cut and package the produce, then distribute the finished product for Fresh Mix accounts together with its own. With a single exception, the packaging on the product would identify it as "Distributed by Get Fresh Companies" regardless of whether the item was being sold on a Fresh Mix or GFSI account.[1]

The logistics undertaken by the companies to sell their products were extensive. The companies would assess whether a potential new product could be produced, what price it had to be sold at, and whether it could be delivered to a customer during the time frame that customer wanted it, among other issues. Trial Transcript, ECF No. 844 at pp. 235:19-237:23. The addition of new products or new customers required the completion of multiple forms. *Id.* at pp. 235:22-236:17. One of the forms included a box that, if checked, would designate that the item sold was a Fresh Mix item. *Id.* at pp. 237:24-238:3. Accordingly, at the time a new item or client was entered into the companies' system, it was coded as belonging to Fresh Mix or GFSI. Subsequent sales were tracked and reported according to that internal coding. *Id.* at pp. 238:7-12; 262:3-19.

//

---

[1] The only product sold under the Fresh Mix name was a cheesecake sold to Trader Joe's. Trial Transcript, ECF No. 846 at p. 47:24-17.

The companies maintained a list that reflected which items and customers belonged to GFSI and which to Fresh Mix. *Id.* at pp. 241:17-242:2.

It is not exactly clear how Fresh Mix accounts placed their orders - whether they went through Fresh Mix or GFSI. It is clear, however, that GFSI created and delivered the products. The packaging for each product stated that they were distributed by GFSI. And it was GFSI that invoiced the customers, including accounts belonging to Fresh Mix. Ultimately, GFSI billed the Fresh Mix accounts and collected the receivables on Fresh Mix accounts. Trial Transcript, ECF No. 846 at pp. 231:7-232:3. All receivables remained on GFSI's invoices regardless of the company that sold the product. The payments were made payable to GFSI alone.

Because GFSI was responsible for all collections, Fresh Mix's financials would reflect amounts due from GFSI for any amounts owed on Fresh Mix accounts. *Id.* at pp. 234:18-235:9. GFSI collected data daily for sales on both Fresh Mix and its own accounts. It would then allocate the revenue to Fresh Mix under a daily compilation. *Id.* at pp. 227:8-17; 229:3-9. GFSI's accounting department provided the daily compilations to Fresh Mix.  GFSI would then run a monthly report reflecting what monies were allocated to Fresh Mix on a daily basis. *Id.* at pp. 233:24-234:3. GFSI then attributed the costs and expenses associated with the revenue on the GFSI or Fresh Mix accounts respectively. Trial Transcript, ECF No. 846 at p. 226:18-22.  As shown in Trial Exhibit 173, GFSI's monthly margin analysis would compute the daily sales and costs to calculate a daily gross and net profit. The report would further break down the sale, costs and gross profit by customer. GFSI included the commissions due to LC Marketing and other brokers where applicable on Fresh Mix accounts. *See* Trial Exhibit 173.

//

**B. LC Marketing**

**1. The 2014 Agreement**

Fresh Mix used brokers to acquire and expand its accounts and customers. Lagudi sought out LC Marketing Corp. (LC Marketing), a California food broker with whom Lagudi had an established relationship, to obtain additional Fresh Mix accounts. On February 28, 2014, GFSI, not Fresh Mix, entered into an Agreement of Sales Representation (2014 Agreement) with LC Marketing. *See* Trial Exhibit 137, ECF No. 830-137. The 2014 Agreement was drafted by LC Marketing and signed by Elizabeth Cohen-Dideriksen (Cohen) as president of LC Marketing. *Id.* Goldberg signed the agreement for GFSI as CFO. The 2014 Agreement was three pages long, and established LC Marketing's role as *GFSI's* broker:

> [GFSI] hereby appoints the Broker, and the Broker hereby agrees to act for [GFSI], as its sole and exclusive Representative for negotiation of sales of products…within the territory described as follows:  Costco, Corporate and all Regions; Kroger – Excluding Kroger Las Vegas; Gelson's; Restaurant Depot.

*Id.* at p. 1, ¶ 1.

Though the 2014 Agreement speaks in terms of territory, the parties agree that it defined LC Marketing's accounts on which it would receive its commissions. "Kroger Las Vegas" operates in Nevada as Smith's. Trial Transcript, ECF No. 844, at pp. 91:18-22; 117:6-8. Goldberg testified that GFSI has been doing business with Smith's since the 1990s, and for that reason LC Marketing would not receive commissions for sales to Smith's. *Id.* at p. 180:5-9. Accordingly, "Kroger Las Vegas" was carved out of territory included in the 2014 Agreement.

In exchange for its brokerage services, LC Marketing was to be paid a commission of three percent (3%) of GFSI's sales to the listed businesses. Trial Exhibit 137, ECF No. 830-137 at p. 1, ¶ 4. The 2014 Agreement included a clause that allowed either party to terminate the

2014 Agreement on four months' written notice. *Id.* at p. 3, ¶ 12. Finally, the 2014 Agreement included a provision allowing for its amendment in writing if "signed by all of the parties hereto." *Id.* at ¶ 14.

During the hearing, Goldberg testified that he never spoke to or met Cohen. He stated that he signed the 2014 Agreement after it was presented to him by Lagudi. Trial Transcript, ECF No. 844 at pp. 168:2-18; 171:9-172:1. Cohen testified that she did not speak to Goldberg until June of 2019. *Id.* at p. 116:22-23. It is abundantly clear that all parties did not distinguish between GFSI and Fresh Mix. Cohen testified that until this bankruptcy case was filed, she understood Fresh Mix and GFSI to be one and the same. *Id.* at p. 128:15-18. Indeed, having never seen the 2014 or 2016 Agreements, the accounting department for Fresh Mix and GFSI also understood the contract to be between Fresh Mix and LC Marketing. Trial Transcript, ECF No. 846 at pp. 220:23-221:9. This confusion was perpetuated in how the companies presented Lagudi. His business card prominently reads "Get Fresh," though his title is listed as Fresh Mix president. Trial Exhibit 16, ECF No. 830-16. Lagudi's email was listed using a Get Fresh domain and promoting the Get Fresh Companies and the Get Fresh website. *Id.*

When asked why GFSI entered into the 2014 Agreement instead of Fresh Mix, Goldberg testified that he presumed LC Marketing "wanted to be connected to where the money was." Trial Transcript, ECF No. 844 at p. 172:18-20; ECF No. 846, at p. 230:23-25.

### 2. The 2016 Agreement

Subsequently, on January 4, 2016, GFSI and LC Marketing executed a second Agreement of Sales Representation (2016 Agreement, and together with the 2014 Agreement, the Broker Agreements). The 2016 Agreement does not reference the 2014 Agreement, nor is there any mention of amendment to the 2014 Agreement. Regardless, the parties appear to agree

that the 2016 Agreement sought to amend the 2014 Agreement. Trial Transcript, ECF No. 844 at pp. 97:4-98:15 and 237:17-239:3; ECF No. 846 at p. 64:5-8. Though the 2016 Agreement is largely identical to the 2014 Agreement, the list of "territories" under paragraph one of the 2016 Agreement lists the following: Costco Corporate Produce; Costco Processed Regional West Coast; Gelson's; Ralphs; Sam's Club; and Walmart. Trial Exhibit 8, ECF No. 830-8, at p. 1, ¶ 1. Further, paragraph twelve of the 2016 Agreement removes the termination provision. Instead, it states: "This Agreement shall continue in effect for the customers and product categories generated by LC Marketing as listed in paragraph 1, as long as they purchase such products from Get Fresh Sales. Additional customers may be added from time to time by mutual agreement." *Id.* at p. 3, ¶ 12. Notwithstanding the exclusion of the termination provision, paragraph thirteen continues to provide for payment to LC Marketing to continue for six months after a notice of termination is given. *Id.* at ¶ 13.

Unlike the 2014 Agreement, the 2016 Agreement was signed by Paul Lagudi as president of GFSI, and Per Dideriksen as vice president of sales for LC Marketing. *Id.* Cohen testified that Dideriksen was authorized to enter into the 2016 Agreement on behalf of LC Marketing. Trial Transcript, ECF No. 844 at p. 115:12-21. The testimony as to Lagudi's authority to enter into the 2016 Agreement on behalf of GFSI is split, however. Lagudi testified that he signed the 2016 Agreement at the direction of Goldberg and while in Goldberg's presence. Trial Transcript, ECF No. 846 at p. 55:2-19. Goldberg testified that he did not authorize Lagudi to sign the 2016 Agreement. *See* Trial Transcript, ECF No. 844 at 199:11-17. Goldberg testified that he was not even aware of the 2016 Agreement at the time it was entered into. *Id.* at p. 181:7-13.

//

### 3. Performance of LC Marketing's Broker Agreements

No party contests that LC Marketing did, in fact, acquire new accounts for Fresh Mix, or that GFSI sold products on those accounts. Though the contracts were with GFSI, it was Fresh Mix that paid the commissions to LC Marketing before its bankruptcy filing. Trial Transcript, ECF No. 844 at pp. 128:19-21; and 172:25-173:2; ECF No. 846 at pp. 43:13-14; 54:9-15; and 224:24-225:1; Exhibit 83. According to the summary presented at the evidentiary hearing, from 2016 to 2021 Fresh Mix paid LC Marketing the following total annual commissions:

| Year | Commissions |
|------|-------------|
| 2016 | $279,713.00 |
| 2017 | $233,482.00 |
| 2018 | $188,316.00 |
| 2019 | $146,196.00 |
| 2020 | $ 63,769.00 |
| 2021 | $ 18,396.00 |

*See* Trial Exhibit 83, ECF No. 830-83. These commissions were for sales to Costco, Ralphs, and Walmart, consistent with the terms of the 2016 Agreement. Starting in 2017, Fresh Mix paid LC Marketing a small amount of commissions for sales to Smith's. *Id.* This reflected a new line of products Fresh Mix sought to develop under the name Sous Vide. *See* Trial Transcript, ECF No. 844 at p. 139:2-12.

Overall, Cohen testified that she believed the amounts reflected in the summary were accurate. *Id.* at pp. 85:19-87:25. She also testified, however, that although it was customary for vendors to send LC Marketing copies of invoices or purchase orders on receipt, neither Fresh Mix nor GFSI did so. *Id.* at pp. 74:20-23; 84:9-10; and 85:5-7. Instead, LC Marketing received monthly reports of the Fresh Mix sales together with its payment checks. *Id.* at pp. 68:18-23 and 85:8-10. Cohen testified that LC Marketing repeatedly requested back up information from Lagudi to support the numbers on the report, but it never received that information. As a result,

Cohen said that LC Marketing "never knew if we were being paid correctly or not." *Id.* at p. 74:20-25. That said, there is no evidence that LC Marketing disputed the calculation of its commissions, or any other part of its brokerage contract with GFSI, prior to Fresh Mix's bankruptcy filing.

In addition to establishing new accounts for Fresh Mix, LC Marketing re-established a relationship that had previously been terminated between Walmart and GFSI. *Id.* at pp. 96:22-25 and 192:3-5. LC Marketing facilitated the restoration of GFSI's vendor number with Walmart. *Id.* at p. 232:11-16. LC Marketing did not, however, establish a Walmart vendor number for Fresh Mix. *Id.* at pp. 232:17-233:1. Rather, the account was simply designated as a Fresh Mix account subject to a commission.

Although Get Fresh continues to do business with Walmart, *see* Trial Transcript, ECF No. 844, at p. 185:15-16, not all of the relationships established by LC Marketing withstood the test of time. Costco ended its relationship with GFSI in August 2018. Kroger/Smith's Sous Vide stopped purchasing product from GFSI in July 2019. GFSI's relationship with Ralphs ended in 2020. *See* Trial Exhibit 9, ECF No. 830-9, at pp. 3, 5.

**C. UPCs**

Cohen and Lagudi testified that LC Marketing's commissions were based on the Uniform Product Codes (UPCs) assigned to the products Fresh Mix sold to retailers. Trial Transcript, ECF No. 844 at pp. 52:9-11; 101:9-102:3; and 126:1-9. According to Cohen and Lagudi, the UPC reflects ownership of the product to which it is affixed. *Id.* at pp. 71:25-72:6; 93:19-22; and 102:18-19. Cohen testified that if a given product with a UPC was sold to a retailer LC Marketing had brought in for a client, *i.e.* Fresh Mix, LC Marketing would earn a commission on the sale of that product; but if that same product with the same UPC were sold to a retailer that

LC Marketing did not broker for the client, LC Marketing would not earn a commission. *Id.* at pp. 101:9-102:3 and 104:18:23.

Lagudi testified that he procured the UPCs on behalf of Fresh Mix, such that all the UPCs belonged to Fresh Mix. *Id.* at p. 131:19-24. He denied that GFSI and Fresh Mix shared UPCs. *Id.* In fact, Lagudi accused GFSI of stealing Fresh Mix's UPCs to use on products it sold without crediting those sales to Fresh Mix. *Id.* at p. 148:8-12 and 159:1-10.

Goldberg agreed that UPCs utilized by GFSI were licensed to Fresh Mix. Trial Transcript, ECF No. 844 at p. 213:2-9. However, both Goldberg and Mary Supchak, Vice President of Accounting and Finance for GFSI, testified that the UPCs procured by Fresh Mix were a shared resource used by both GFSI and Fresh Mix. *Id.* at pp. 213:2-4; 217:5-9; and 225:10-20; Trial Transcript, ECF No. 846 at pp. 252:21 ("We had one GS1 account that we shared."); 252:25-253:2; and 254:7-16. Goldberg denied that the UPCs reflected who owned the product to which a UPC was affixed. Trial Transcript, ECF No. 844, at p. 216:16-25. Instead, he testified that notwithstanding the use of a Fresh Mix UPC, if Fresh Mix did not originate the business that resulted in the sale of a given product with a shared UPC, Fresh Mix was not entitled to the revenue generated by that sale. *Id.* at p. 217:1-4.

**D. Termination of Lagudi and Commencement of the Bankruptcy Case**

On November 26, 2018, Lagudi was terminated as president of Fresh Mix. *See* Trial Transcript, ECF No. 846, at p. 31:17-19. Shortly thereafter, Lagudi and Ponder filed a state court lawsuit against Fresh Mix and GFSI. *See* Trial Exhibit 830-149.

On April 23, 2020, GFSI commenced this bankruptcy case by filing an involuntary petition against Fresh Mix. *See* Trial Exhibit 166, ECF No. 830-166. The order for relief was entered on August 11, 2020. *See* Trial Exhibit 830-139. The deadline for filing proofs of claim

was initially set for July 2, 2020, *see* ECF No. 154, but was later extended to November 9, 2020. *See* ECF No. 167.[2] In its Schedule E/F, filed on August 20, 2020 and signed by Scott Goldberg, Fresh Mix included just seven general unsecured debts, two of which were related to LC Marketing: one, designated "Business Debt - Kroger," in the amount of $2,022.00; and the second, designated "Business Debt - Walmart," in the amount of $12,670.00. Trial Exhibit 167, ECF No. 830-167, at p. 9.

### E. Post-Petition

On June 10, 2020, Christian Acosta at GFSI emailed Monica King at LC Marketing. Acosta's email attached tracking spreadsheets for Walmart and Kroger and advised that checks had been requested for commission payments. Trial Exhibit 11, ECF No. 830-11, at p. 5. Ultimately, Kimberly Ayers at GFSI informed King that the payments were delayed due to the Fresh Mix bankruptcy. *Id.* at pp. 1-2. King responded that LC Marketing's sale agreements were with GFSI. Ayers expressed surprise at that, noting that LC Marketing had always been paid by Fresh Mix. *Id.* at p. 1.

On August 18, 2020, King sent a letter to Supchak at GFSI regarding her communications with Ayers. King pointed out that under the Broker Agreements, GFSI was obligated to pay LC Marketing's commissions. Trial Exhibit 10, ECF No. 830-10. On September 10, 2020, Supchak emailed King, notifying her that GFSI would pay LC Marketing's post-petition commissions to "get you up to date." Trial Exhibit 13, ECF No. 830-13. The email makes a vague reference to "appealing to the BK Judge," but concluded that GFSI would "take care of this ourselves." *Id.*

---

[2] Although these notices were not part of the trial record, "[c]ourts routinely take judicial notice of their own court records." *Dunlap v. Neven*, 2014 WL 3000133, at *5 (D. Nev. June 30, 2014) (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006)); *see also* Fed. R. Evid. 201(c).

While the above communications were being exchanged, GFSI sent LC Marketing a letter dated June 23, 2021, notifying it of GFSI's intent to terminate the Broker Agreements effective October 21, 2021. *See* Trial Exhibit 7, ECF No. 830-7. GFSI committed to continue paying LC Marketing its commissions through that date. *Id.* The letter was signed by Goldberg. *Id.* King responded to the termination letter via email on June 30, 2021, referencing the 2016 Agreement and asserting that LC Marketing was entitled to commissions so long as GFSI continued to sell to Walmart. Trial Exhibit 19, ECF No. 830-19.

As reflected in the summary of commissions paid to LC Marketing, the last commissions paid to LC Marketing were in September and November, 2021 from Walmart sales. Trial Exhibit 83.

Over six months later, on January 28, 2022, King emailed Ashley Matzke at GFSI requesting an updated report. Trial Exhibit 20, ECF No. 830-20 at pp. 3-4. Goldberg responded on February 1, 2022, referencing the June 23, 2021 termination letter and referring King to GFSI's lawyer. *Id.* at pp. 1-2. King responded that same day, referencing her own reply regarding GFSI's alleged ongoing liability to LC Marketing for commissions on sales to Walmart. *Id.* at p. 1. The following day, Goldberg emailed King, informing her that she had "a contract that contradicts another version … Mr. Lagudi was never and [sic] officer or employee of Get Fresh, nor authorized to sign any contract on behalf of Get Fresh…" Trial Exhibit 66, ECF No. 830-66, at p. 1. Goldberg again advised King to contact GFSI's attorney. *Id.*

## F.  LC Marketing's Proof of Claim and Assignment to EITE

Despite being listed as a creditor in the original bankruptcy schedules, LC Marketing failed to file a proof of claim by the extended November 9, 2020 bar date. More than a year later, on February 14, 2022, LC Marketing filed its initial proof of claim 7-1 in the Fresh Mix

bankruptcy case, in the amount of $6.7 million. *See* Trial Exhibit 1, ECF No. 830-1. The basis for the proof of claim was stated as "Ongoing Commissions." *Id.* at p. 1. Attached to the proof of claim in support was a narrative "explanation in support" of the claim. In that narrative, LC Marketing conceded that "[w]hile LC was identified as a creditor, LC was not owed any back payments as Get Fresh continued to make regular monthly payments for amounts owed by Fresh Mix in accordance with the normal terms and conditions of the Contract." *Id.* at p. 4. Further, LC Marketing described two components of its claim: future amounts owed on business Fresh Mix previously made commission payments on, calculated at $270,000.00 per year for 10 years, or $2.7 million; and future amounts owed on business that Fresh Mix "has hidden from LC Marketing," estimated at $400,000.00 per year for 10 years, or $4 million. *Id.* at p. 5. Accordingly, the entire basis for proof of claim 7-1 was future commissions. Cohen testified that Lagudi helped her draft the narrative attached to proof of claim 7-1. Trial Transcript, ECF No. 844, at p. 88:22-25. She also stated that the majority of the numbers in proof of claim 7-1 came from Lagudi. *Id.* at p. 91:1-6.

On March 10, 2022, LC Marketing assigned proof of claim 7-1 to "E.I.T.E. Recovery, LLC." *See* Trial Exhibit 2, ECF No. 830-2. EITE Recovery, LLC (EITE) was created on February 14, 2022 by Roman Lagudi, who is Paul Lagudi's son. *See* Trial Exhibit 5, ECF No. 830-5. Roman testified that he created EITE for the sole purpose of acquiring proofs of claim. Trial Transcript, ECF No. 844 at p. 8:20-22. As of the evidentiary hearing, the only proof of claim acquired by EITE is LC Marketing's proof of claim filed in this bankruptcy case. *Id.* at p. 9:12-14. Roman testified that he discussed the idea of purchasing LC Marketing's claim with his father, who prepared proof of claim 7-1 with Cohen.  *Id.* at p. 9:20-22. As consideration for the transfer, EITE pledged to pay LC Marketing ten percent of any recovery on proof of claim 7-1.

*Id.* at p. 15:14-25. Cohen testified that she agreed to transfer proof of claim 7-1 to EITE because she is "just really busy" and "was fine with it." *Id.* at p. 90:5-9.

On February 25, 2022, GFSI filed the Objection. GFSI stated four bases for disallowance:

1. LC Marketing's contract is with GFSI, not Fresh Mix.

2. LC Marketing's claim is based on future sales, which cannot occur because Fresh Mix ceased operations when the bankruptcy was filed in 2020.

3. The 2014 Agreement is the true contract; the 2016 Agreement was signed by Lagudi without authority to bind GFSI.

4. The late filing of Claim 7-1 proves it arises from a dispute between LC Marketing and GFSI over termination of the 2014 Agreement.

ECF No. 442 at pp. 2:6-3:6.

EITE opposed the Objection (ECF No. 467) (Opposition). It points out that Fresh Mix paid LC Marketing's commissions, and that LC Marketing had been scheduled as a creditor in Fresh Mix's schedules. EITE further highlighted Goldberg's reference to the 2016 Agreement in his June 23, 2021 termination letter sent to LC Marketing, as well as GFSI's post-petition payments to LC Marketing for sales to Walmart, which were made pursuant to the 2016 Agreement. In his declaration filed in support of the Opposition, Lagudi stated under oath that the 2016 Agreement replaced the 2014 Agreement. Trial Exhibit 159, ECF No. 830-159, at p. 2:13-14.

After the initial hearing on the Objection the court entered its scheduling order on April 14, 2022. ECF No. 502. The evidentiary hearing was set for July 25, 2022, with discovery to close on June 24, 2022. *Id.* On June 16, 2022, the parties filed a stipulation extending the discovery deadline to July 11, 2022. ECF No. 614. That same day, GFSI filed a motion for partial summary judgment on its Objection. *See* ECF No. 616. The hearing on the motion and the

scheduled evidentiary hearing were continued several times.[3] The court denied the motion for summary judgment. *See* ECF No. 717.

The parties filed their trial briefs on November 8, 2022. *See* ECF Nos. 812 and 814. GFSI's amended trial brief was filed on November 11, 2022. *See* ECF No. 825.  That same day, LC Marketing filed amended proof of claim 7-2 (Claim 7-2). *See* Trial Exhibit 18, ECF No. 830-18. Claim 7-2 still listed Lisa Cohen as the person to whom notices regarding the claim should be sent, *id.* at p. 1, and was signed by Cohen, not Roman Lagudi. *Id.* at p. 3. The amendment increased the total amount owing to $10,864,408.84. *Id.* at p. 2. Instead of disavowing any past due amounts owed, the attached narrative stated that the amounts owed to LC Marketing as listed in Schedule E/F were grossly understated. *Id.* at p. 4. According to Claim 7-2, GFSI "wrongfully diverted, or underreported commissions from Kroger/Smiths, that amounts to an additional $3,864,408.84 in unpaid commissions that are due to LC from 2016-2022." *Id.* at p. 5. LC Marketing asserted that the missing commissions had only been recently revealed through the discovery process related to the Objection. *Id.*

Thereafter, on November 14, 2022, EITE filed amended proof of claim 7-3 (Claim 7-3). Claim 7-3 corrected the claimant to EITE, reflecting it had acquired the claim from LC Marketing. Claim 7-3 was signed by Roman Lagudi. All other aspects of Claim 7-3 are identical to claim 7-2. GFSI filed its motion to strike Claim 7-2 the day Claim 7-3 was filed. *See* ECF No. 827.

---

[3] On October 14, 2022, EITE filed a motion asking the court to abstain from hearing the Objection. ECF No. 779. The basis for abstention was the chapter 7 trustee's filing of cross-claims against GFSI, among others, in state court litigation, asserting potential bases for piercing the corporate veil between GFSI and Fresh Mix. *Id.* at p. 2. EITE argued that "a determination of alter ego liability, conversion and embezzlement are key pieces of the…Objection." *Id.* at p. 2:25-26.  Opposed by GFSI, the court entered its order denying the motion to abstain for the reasons stated on the record at the November 1, 2022 hearing. *See* ECF No. 802.

The court held its evidentiary hearing on the Objection on November 17 and 18, 2022. Closing arguments were heard on November 22, 2022. During closing arguments, EITE waived its $6.7 million claim for future damages and withdrew its alter ego argument. Trial Transcript, ECF No. 860, at pp. 47:9-19 and 48:3-4. At the conclusion of argument, the court took the Objection and the motion to strike Claim 7-2 under advisement.

## Analysis

The above facts clearly demonstrate that LC Marketing earned commissions from the sale of GFSI produce and products attributed to Fresh Mix accounts. EITE, as assignee of LC Marketing's rights, now claims that Fresh Mix owes millions of dollars for unpaid commissions. The basis for its claims has evolved. EITE has abandoned LC Marketing's original claims for future commissions from Fresh Mix. Instead, it now contends that Fresh Mix owes commissions for prepetition sales discovered by examining records for sales made under UPCs on LC Marketing accounts. Though LC Marketing's contracts were with GFSI, it argues that Fresh Mix is liable as the real party in interest. In an unusual twist, GFSI argues that it, not Fresh Mix, is liable for any claims for unpaid commissions under the Broker Agreement(s).[4] Perhaps more to the point, GFSI believes that no additional commissions are owed.

The first, and most fundamental, question is whether LC Marketing has any rights to assert a claim against Fresh Mix for unpaid commissions.[5] Under Fed. R. Bankr. P. 3001(f),

---

[4] This is not the first time in this bankruptcy that ordinary considerations of commercial practice have been turned on their head.

[5] EITE's proof of claim was untimely filed. Yet, the parties have largely ignored this issue. An evidentiary hearing on an untimely proof of claim filed in a chapter 7 estate only makes sense if the estate will have a sufficient recovery to pay untimely claims under 11 U.S.C. § 726(a)(2)(3). The claims question has been a lurking issue underlying the bankruptcy from the inception of the case. EITE's claim appears to be a significant development on this issue. If allowed, the claim could require that the trustee pursue additional assets to pay timely and untimely filed claims, and continue a contentious state court action.

16

EITE's claim constitutes prima facie evidence of the validity and amount of the claim so long as it was "executed and filed in accordance with these rules." This presumption of validity may be rebutted with evidence "tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *The Margulies Law Firm v. Placide (In re Placide)*, 459 B.R. 64, 72 (B.A.P. 9th Cir. 2011) (quoting *Lundell v. Anchor Constr. Specialists, Inc. (In re Lundell)*, 223 F.3d 1035, 1039 (9th Cir. 2000)). EITE's proof of claim is supported by contracts between LC Marketing and GFSI. This calls into question the debtor's liability. EITE now responds that LC Marketing mistakenly entered into the Broker Agreements with GFSI rather than Fresh Mix. Alternately, it contends that there was an implied-in-fact contract between LC Marketing and Fresh Mix. Finally, it argues that at a minimum EITE must be awarded additional commissions as quantum meruit to prevent unjust enrichment.

The court finds that GFSI has presented sufficient evidence to rebut the presumption of validity under Rule 3001(f). Accordingly, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.'" *In re Consol. Pioneer Mortg.*, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995), *aff'd sub nom. In re Consol. Pioneer Mortg. Entities*, 91 F.3d 151 (9th Cir. 1996). Notwithstanding the rebuttable presumption of prima facie validity, the burden of persuasion remains with EITE as the claimant. *Litton Loan Servicing, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 707 (B.A.P. 9th Cir. 2006) (citing *Diamant v. Kasparian (In re So. Cal. Plastics, Inc.)*, 165 F.3d 1243, 1248 (9th Cir.1999)).

### A. Who is Liable to LC Marketing for Any Unpaid Commissions?

#### 1. Reformation of the Agreements for Mutual Mistake

EITE argues that the court should exercise its equitable power to recognize Fresh Mix is liable to LC Marketing under the Broker Agreements rather than GFSI. Under Nevada law, a

court may "reform a written instrument where it appears that there has been fraud, accident or mistake which has brought about a writing not truly representing the actual agreement of the parties." *Realty Holdings, Inc. v. Nevada Equities, Inc.,* 633 P.2d 1222, 1223 (Nev. 1981) (quoting *Roberts v. Hummel*, 243 P.2d 248, 250 (1952)); *see also Grappo v. Mauch*, 110 Nev. 1396, 1399, 887 P.2d 740, 742 (1994). Reformation is designed to apply when a "written instrument fails to conform to the parties' previous understanding or agreement." *Grappo*, 110 Nev. at 1398, 887 P.2d at 741. Nevada requires clear and convincing evidence to reform a contract. *Id.* (reformation of deed of trust for mutual mistake); *see also In re Irrevocable Tr. Agreement of 1979*, 331 P.3d 881, 888 (2014) (reformation based on unilateral mistake required clear and convincing evidence).

EITE has failed to identify a fraudulent misrepresentation or unilateral mistake. Rather, it argues "there appears to have been a mutual mistake between the parties as contained in the written Second Agreement – the signature block may have been an error." ECF No. 812 at p. 11:16-17. A mutual mistake is "a mistake reciprocal and common to both parties, when each alike labored under the same misconception in respect to the terms of the written agreement." *Realty Holdings*, 633 P.2d at 1223 (quoting *Wilson v. Wilson*, 45 P. 1009, 1010 (Nev. 1896)).

The exact mistake at issue remains unclear: was it the 2014 Agreement, the 2016 Agreement, or both? EITE's pretrial statement suggested the mistake was simply the signatory block for GFSI because Lagudi signed the 2016 Agreement. The suggestion is that the 2016 Agreement should have been between LC Marketing and Fresh Mix because Lagudi was the president of Fresh Mix. That is certainly a possibility. But it is contradicted by, and contrary to, the 2014 Agreement. That agreement was duly executed by LC Marketing and GFSI.  LC Marketing does not challenge the 2014 Agreement with GFSI.

Moreover, Cohen testified that LC Marketing drafted both agreements. It used its standard broker forms for both agreements. This is significant. At some point, LC Marketing chose to contract with GFSI. It drafted the agreements with GFSI as the party it chose to contract with and to whom it would render the broker services. It did this not once, but twice. The evidence does not support a finding that this was a mistake, or that there was a reason to change the contracting parties in the 2016 Agreement. Rather, the 2016 Agreement appears to change LC Marketing's accounts and the terms for termination of the agreement.

The testimony of Lagudi and Cohen revealed that they were not concerned with the legal formalities between GFSI and Fresh Mix. Cohen stated that she believed that the two entities were the same. LC Marketing dealt primarily, if not exclusively, with Lagudi. He was the point of contact for communication as to the new accounts and new products, though GFSI created and distributed the products, invoiced the customers and collected the receivables. Ultimately, however, Fresh Mix paid LC Marketing its commissions until it was placed into bankruptcy.

After Fresh Mix was placed into bankruptcy, LC Marketing sought to enforce its contractual rights against GFSI. LC Marketing did not timely file a proof of claim against Fresh Mix for its unpaid commissions earned on sales from Fresh Mix accounts that GFSI continued to service. Rather, it collected the outstanding commissions directly from GFSI under the Broker Agreements. In response, GFSI gave notice to LC Marketing that GFSI was terminating its broker relationship with LC Marketing under the terms of its contract with LC Marketing. These actions are consistent with a contract between LC Marketing and GFSI as stated in the Broker Agreements.

GFSI questions Lagudi's authority to enter into the 2016 Agreement on its behalf. EITE also questions Lagudi's authority to enter into the second broker contract. Yet, Lagudi testified

that Goldberg instructed him to sign the 2016 Agreement suggesting that he was authorized to sign the contract on behalf of GFSI. It appears that GFSI accepted the change in LC Marketing's accounts detailed in the 2016 Agreement as it paid commissions for sales to Walmart which were not covered under the 2014 Agreement. Again, LC Marketing drafted the contract with GFSI and accepted Lagudi's signature on behalf of GFSI. And it sought to enforce the 2016 Agreement to continue to receive commissions from GFSI's Walmart sales after Fresh Mix was placed into bankruptcy.

The court need not decide whether GFSI and LC Marketing are bound by the 2016 Agreement. The 2016 Agreement is relevant, however, to EITE's claim because it further demonstrates that LC Marketing chose to continue its contractual relationship with GFSI. Lagudi's involvement in the 2016 Agreement is puzzling as he was clearly aware of his role. If Lagudi believed that LC Marketing was contracting with Fresh Mix, it was incumbent on him to correct that mistake on the 2016 Agreement. He did not. He stated by way of explanation that Goldberg instructed him to trust that Fresh Mix and GFSI were all the same team. Based on the totality of the evidence presented, this has a ring of truth to describe the parties' business operations. GFSI controlled operations and had its own business before Fresh Mix was created. When it acquired Lagudi Enterprises and formed Fresh Mix, it absorbed Fresh Mix's accounts and welcomed new accounts from Fresh Mix acquired by its brokers, including LC Marketing. But these accounts belonged to GFSI – they were serviced, billed, and collected the receivables. Fresh Mix simply received the net proceeds from the sales on those accounts.

In short, the court does not believe that either LC Marketing or GFSI mistakenly entered into the 2014 Agreement or the 2016 Agreement. Fresh Mix was not mistakenly omitted from

//

either, or both, contracts. Accordingly, EITE has failed to prove any basis to reform either contract to replace GFSI with Fresh Mix as the principal for LC Marketing's broker services.

### 2. Implied-in-Fact Contract

Despite the written contract(s) with GFSI, EITE encourages the court to find that a binding contract existed between LC Marketing and Fresh Mix based on the parties' performance and course of dealing. *See Smallman v. MGM Resorts Int'l*, --- F.Supp.3d ---, 2022 WL 16636958, at *9 (D. Nev. Nov. 2, 2022) (quoting *Smith v. Recrion Corp.*, 541 P.2d 663, 664–65 (Nev. 1975)) ("Although the terms of an implied contract are manifested by conduct rather than written words as in an express contract, both 'are founded upon an ascertainable agreement.'"). "To find a contract implied-in-fact, the fact-finder must conclude that the parties intended to contract and promises were exchanged, the general obligations for which must be sufficiently clear." *Certified Fire Prot. Inc. v. Precision Constr.,* 283 P.3d 250, 256 (Nev. 2012). Such a claim sounds in law; it is dependent on whether there "is a true contract that arises from the tacit agreement of the parties." *Id.* (citing 1 Joseph M. Perillo, *Corbin on Contracts* § 1.20, at 64 (rev. ed. 1993)).

The court's findings on mutual mistake also preclude any recovery under EITE's claim based on a contract implied-in-fact. As explained above, LC Marketing and GFSI intended to enter into both Broker Agreements. The existence of those contracts precludes EITE's claim under an implied contract-in-fact. *See Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (1997) (a claim for an implied-in-fact contract "is not available when there is an express, written contract, because no agreement can be implied when there is express agreement.").  LC Marketing did not have separate contracts for broker services with

GFSI *and* Fresh Mix. Rather, it served as broker for GFSI. Fresh Mix was merely entitled to the net proceeds from the sales on LC Marketing's accounts.[6]

### 3. Unjust Enrichment

EITE also argues that Fresh Mix was unjustly enriched by LC Marketing's services. "Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is 'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Certified Fire,* 283 P.3d at 257 (citing *Unionamerica Mtg. v. McDonald,* 626 P.2d 1272, 1273 (1981)). "The basis of recovery on quantum meruit ... is that a party has received from another a benefit which is unjust for him to retain without paying for it." *Id.* at 258 (quoting *Thompson v. Herrmann,* 91 Nev. 63, 68, 530 P.2d 1183, 1186 (1975)).

EITE has argued that Fresh Mix is unjustly enriched by retaining the benefits of the sales on its brokered accounts without paying the commission. Assuming there are unpaid commissions, LC Marketing, and EITE as its assignee, have recourse against GFSI for breach of contract. Confusingly, EITE is insistent on pressing its indirect claim against a bankrupt debtor

---

[6] Mary Supchak explained this in her testimony:

Q. And I think at some point, Fresh Mix has just been described as a mere marketing company, right?

A. Fresh Mix collected the sales that were attributable to Paul and Todd.

Q: Well, you just said that Get Fresh actually collected the receivables.

A: I mean, collected as an entity. That's what appeared in Fresh Mix is the sales and costs that go with them and the administrative costs as allowed in the operating agreement that were attributed to Paul and Todd. That's what Fresh Mix did.

Trial Transcript, ECF No. 846 at pp. 253:22-254:6.

rather than against the contracting party that continues to operate significant business.  But there is no evidence that Fresh Mix *received* net proceeds from GFSI and LC Marketing failed to receive the outstanding commissions. As discussed above several times, LC Marketing did, in fact, demand payment for unpaid commissions directly from GFSI once Fresh Mix was placed into bankruptcy. GFSI paid those commissions. It appears that such payments were for outstanding prepetition sales and commissions as well as some postpetition sales. Accordingly, there is no evidence that Fresh Mix has been unjustly enriched by withholding commissions due to LC Marketing.

**B.  EITE Has Failed to Prove Any Additional Commissions Are Owed.**

The court concludes that EITE has not established that it is a creditor of Fresh Mix. Any claims for unpaid commissions lie against GFSI for breach of either the 2014 Agreement or 2016 Agreement. But to the extent that Fresh Mix is liable to LC Marketing for unpaid prepetition commissions, EITE has failed to prove that any commissions remain unpaid.

Both Broker Agreements obligated LC Marketing to serve GFSI "as its sole and exclusive Representative for negotiation of sales of products, subject to terms, provisions and conditions hereof …."  The 2014 Agreement defined LC Marketing's territory to be "Costco, Corporate and all Regions; Kroger – Excluding Kroger Las Vegas; Gelson's; Restaurant Depot." Trial Exhibit 137, ECF No. 830-137 at p. 1. The parties agree that the reference to Kroger Las Vegas excluded sales to Smith's. The 2016 Agreement similarly designated LC Marketing as GFSI's exclusive broker but listed the territory as "Costco Corporate Produce, Costco Processed Regional West Coast, Gelson's, Ralphs, Sams [sic] Club, [and] Walmart." Trial Exhibit 8, ECF No. 830-8 at p. 1.

The parties admitted LC Marketing's payment history into evidence as Trial Exhibit 83. It shows that LC Marketing received most of its commissions from sales to "Ralphs–Kroger"

between January 2016 and March 2020. The commissions from Ralphs-Kroger were invariably the largest payments on a monthly or annual basis. LC Marketing also received commissions on a fairly regular basis from Costco between January 2016 through August 2018. The commissions for sales to Costco ended in August 2018. The payment history includes commissions paid to LC Marketing for sales to Walmart between January 2016 and April 2021.[7]

EITE claims that these payments excluded other GFSI sales for which LC Marketing was entitled to commissions. The parties admitted a summary of GFSI's sales from 2016 through 2022 for certain Smith's-related entities and Kroger-related entities. Trial Exhibit 171. EITE contends that LC Marketing is owed commissions for all GFSI's reported sales on the summary. Sales to the Smith's-related entities in the summary exceeded $121,000,000. The basis for including these sales is unclear. The original 2014 Agreement expressly excluded Kroger Las Vegas, which the parties agree excluded sales to Smith's. The 2016 Agreement did not include any reference to Smith's. Accordingly, LC Marketing never had a right to commissions under either or both agreements for sales to Smith's with the limited exception for sales to Smith's under the "Sous Vide" label. It appears that LC Marketing received its commissions for those sales to Smith's.

The remainder of the commissions sought by EITE are for prepetition sales to other Kroger-related entities. None of these specific entities are included in the 2016 designation of LC Marketing's territory. As with sales to Smith's, the 2016 Agreement does not support any claim

[7] The summary of commissions reflects additional small intermittent payments attributed to sales to Smith's. Though the 2014 Agreement excluded GFSI's sales to Smith's as "Kroger Las Vegas," LC Marketing and Fresh Mix were attempting to place a new line of products under the name "Sous Vide" to various customers including Smith's. There is no dispute that LC Marketing was entitled to commissions for sales under the Sous Vide account, including Sous Vide sales to Smith's even though that account would appear to be excluded under the 2014 Agreement and was not listed in the 2016 Agreement.

for additional commissions for sales to Kroger-related entities other than Ralphs. The parties do not dispute that LC Marketing has received its commissions for sales to Ralphs. Rather, the basis for EITE's argument for additional commissions from sales to Kroger-related entities other than Ralphs or Smith's rests in the general language of the 2014 Agreement. It maintains that the 2016 Agreement merely supplemented the 2014 Agreement. That is, EITE believes the 2016 Agreement added to the 2014 Agreement but did not replace it.

The changes in the 2016 Agreement belie EITE's argument.  The 2016 Agreement specifically included Ralphs as part of LC Marketing's territory/customers subject to commissions. This makes no sense if the 2014 Agreement remained effective as Ralphs was part of the broader inclusion of all Kroger entities, except Kroger Las Vegas (Smith's). Similarly, the termination clauses in the two agreements are at odds. Again, it is inherently inconsistent that the parties would add a contradictory termination provision to an existing clause. Finally, if the only change created by the 2016 Agreement was the addition of Walmart to LC Marketing's commissions, it strains reason to draft another contract to add that account – especially while reciting other accounts already included within LC Marketing's accounts.

To the extent relevant, the court finds that the 2016 Agreement controls LC Marketing's rights to commissions from GFSI's sales. Thus, if the 2016 Agreement were to apply to Fresh Mix, it would be liable to LC Marketing for the commissions earned on GFSI's sales to Ralphs, and no other Kroger entity (with the possible exception of any Sous Vide sales, which are not material). But the 2016 Agreement was between LC Marketing and GFSI, not Fresh Mix, abruptly putting an end to EITE's argument. Nonetheless, it bears mention that the commission payments made to LC Marketing further support this conclusion. Between 2016 and 2020, when sales to all Kroger related entities apparently stopped, no commissions were paid to LC

Marketing other than the regular commissions from sales to Ralphs. EITE argues that this is evidence of concealment. The more straightforward answer is that LC Marketing was not entitled to commissions on GFSI's sales to Kroger entities other than Ralphs. To the extent relevant, the court would consider this payment history strong evidence that the 2016 Agreement set forth the applicable terms between LC Marketing and GFSI, and it did not include commissions on sales to Kroger entities other than Ralphs.

### C. The UPCs Do Not Alter the Ownership of GFSI's Products or Expand LC Marketing's Right to Commissions.

There was considerable testimony during the hearing regarding the UPCs. The parties agree that the UPCs at issue were owned by Fresh Mix. EITE now contends that GFSI's use of any Fresh Mix UPC resulted in Fresh Mix's obligation to pay the LC Marketing commission.

"A Universal Product Code, or UPC, is a combination of a bar code and numbers by which a scanner can identify a product and usually assign a price." *State v. Abel*, 856 S.E.2d 545, 545 n.7 (N.C. 2021), *review denied*, 880 S.E.2d 690 (N.C. 2022), *and appeal dismissed, review denied*, 880 S.E.2d 691 (N.C. 2022) (internal quotation omitted). "These barcodes 'play a key role in supply chains, enabling retailers, manufacturers, transport providers and hospitals to automatically identify and track products as they move through the supply chain.'" *Coin-Tainer Co., LLC v. Pap-R Prod. Co.*, 2019 WL 1873494, at *1 (S.D. Ill. Apr. 26, 2019) (quoting GS1 US, *Standards*, (Apr. 25, 2019), https://www.gs1.org/standards/ barcodes). The numbers at the bottom of the bar code are known as the Global Trade Item Number (GTIN). *See* GS1 US, *Identify a Product or Location*, https://www.gs1us.org/upcs-barcodes-prefixes/how-to-use-your-upc-barcodes/identify-product-or-location (last visited March 20, 2023). The GTIN has three

//

26

components: a GS1/UPC Company Prefix;[8] an item reference number; and a check digit.  GS1

US, *An Introduction to the Global Trade Item Number (GTIN)*, at p. 5 (July 2021),

https://www.gs1us.org/content/dam/ gs1us/documents/industries-insights/standards/Guideline-

An-Introduction-to-the-Global-Trade-Item-Number-GTIN.pdf. According to the retail portion of

the GS1 website, "[t]he GS1 Company Prefix is a unique number that will identify your

company as the owner of your barcode *and the product it's on*."  GS1 US, *GS1 Company Prefix*,

https://my.gs1us.org/product/1024/gs1-company-prefix (last visited January 30, 2023) [emphasis

added].

EITE also relies upon the GS1 Company Prefix Application attached as Exhibit 1 to its

supplemental brief. *See* ECF No. 864 at pp. 10-11. In the first provision of what is described as a

"binding legal contract," the "GS1 US Company Prefix and Identification Key License

Agreement" provides in pertinent part:

> GS1 Company Prefix and GS1 Identification Keys are the property
> of GS1 US and are to be used only by the Licensee in accordance
> with the GS1 US rules and guidelines to identify trade
> items/products…owned or controlled by the Licensee (collectively,
> "Prefix and Identification Keys"). Licensee may not use or modify
> Prefix and Identification Keys other than as provided in this
> Agreement. Prefix and Identification Keys may not be sold, leased,
> sublicensed, or subdivided for use by others.

*Id.* at Exhibit 1, p. 10, ¶ 1.

---

[8] According to educational materials produced by GS1 US, "For GTIN-12, a U.P.C. Company Prefix is used in place of the GS1 Company Prefix."  GS1 US, *An Introduction to the Global Trade Item Number (GTIN)*, at p. 5 (July 2021), https://www.gs1us.org/content/ dam/gs1us/documents/industries-insights/standards/ Guideline-An-Introduction-to-the-Global-Trade-Item-Number-GTIN.pdf.  The UPCs discussed at trial all bear twelve digits, suggesting that they are the GTIN-12 format and thus bear a U.P.C. Company Prefix, not a GS1 Company Prefix.  However, it appears that the only difference between a GS1 Company Prefix and a U.P.C. Company Prefix is the addition of a zero at the beginning of the number.  GS1 US, *Frequently Asked Questions*, https://www.gs1.org/faqs/gs1-company-prefix-barcodes-and-indentification (last visited March 20, 2023).

The parties' supplemental briefing confirms that the UPCs served to identify a product by the licensee. At the hearing, Lagudi similarly explained that the UPCs were "the identification - - unique identification product for someone that owns the brand." Trial Transcript, ECF No. 846 at pp. 71:25-72:1. The UPCs identified Fresh Mix as the licensee owning the bar code. But that is all it identified. Fresh Mix's licenses for the UPCs did not define or affect its relationship with GFSI. Lagudi testified that "there's like 15, 1600 of UPC codes that - - that are owned by Fresh Mix." *Id*. at p. 74:16-17. Lagudi further testified that Fresh Mix never shared its UPC codes with GFSI. *Id*. at p. 131:14-22. But Mary Supchak explained that UPCs were just "one of many, many, many shared resources that were used between our companies, all up and down the line, all the years as whoever needed it used it."*Id*. at p. 232:8-10. She further explained that GFSI maintained two lists under the single GS1 account for the UPCs. *Id.* at p. 239:8-12. Using these lists, sales were be allocated as GFSI or Fresh Mix sales in its reporting. Trial Transcript, ECF No. 844 at p. 225:10-17.

EITE's argument that any product sold under its GS1 account was a Fresh Mix sale is contrary to the totality of the evidence. Fresh Mix shared its GS1 account with GFSI. As a result, all products sold by GFSI were tracked under the Fresh Mix license. Supchak's and Goldberg's testimony, however, is clear that GFSI owned and sold the products. It then invoiced the customers and collected the receivables. Internally, GFSI tracked and allocated the income, costs, and expenses from those sales to either GFSI or Fresh Mix. GFSI's usage of Fresh Mix's UPCs may have violated the licensing agreement, but it did not transfer ownership of the products or the receivables. Rather, the UPCs were merely designed to track products. Fresh Mix and GFSI agreed to track GFSI's sales through Fresh Mix's UPCs. While this is one of several instances where corporate formalities were ignored, it also follows their pattern of presenting the

two entities as one to the public while accounting for the sales internally between themselves. As a result, GFSI's use of Fresh Mix's UPCs is not a separate sufficient basis to attribute all GFSI sales to Fresh Mix for the purpose of increasing the commissions owed to LC Marketing.

### Conclusion

The lack of corporate formality between Fresh Mix and GFSI has impacted multiple aspects of this bankruptcy case. EITE's Claim 7-3 is only the latest. For the reasons stated above, EITE has failed to prove that Fresh Mix is liable for any unpaid commissions earned by LC Marketing. Accordingly, EITE's proof of claim, assigned by LC Marketing, shall be DISALLOWED.[9]

The court will enter a separate order memorializing its rulings.

**IT IS SO ORDERED.**

* * * * *

Copy sent to all parties and/or their counsel via CM/ECF Electronic Notice.

# # #

---

[9] GFSI has also moved to strike proof of claim no. 7-2. In light of the court's ruling the motion to strike shall be denied as moot by separate order.